IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| **NEIS ACQUISITIONS AUXGA, LLC,**<br><br>*Plaintiff*,<br><br>v.<br><br>**TARGET CORPORATION,**<br><br>*Defendant*. | **CIVIL ACTION NO.**<br>**5:24-cv-00126-TES** |

**ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Before the Court are Plaintiff NEIS Acquisitions AUXGA, LLC's and Defendant Target Corporation's cross-motions for partial summary judgment. [Doc. 34]; [Doc. 54]. To resolve this dispute, the Court must answer a straightforward question of contract interpretation: Under the parties' Operation and Easement Agreement ("OEA"), does NEIS or Target have to repair damaged stormwater pipes running under Target's Tract at Eisenhower Crossing Shopping Center in Macon, Bibb County, Georgia? As explained in further detail below, because the OEA clearly and unambiguously assigns this obligation to Target, the Court **DENIES** Target's Motion for Partial Summary Judgment [Doc. 34], and **GRANTS** NEIS's Motion for Partial Summary Judgment [Doc. 54].

## BACKGROUND

The Court begins with the brief factual background of this dispute.[1]

### A.    Factual Background

On June 20, 2000, Target and non-party Faison-Sofran Partnership No. II entered into an OEA[2] which governs the operation, common use, maintenance, and repair of Eisenhower Crossing (the "Shopping Center"). [Doc. 43-1, ¶¶ 1, 3]. With Target's Tract on the south (left) end, the Shopping Center's layout is generally depicted by the following site map:

[*Id.* at ¶ 6].



---

[1] Unless otherwise noted, the Court cites to NEIS's Response to Defendant Target Corporation's Statement of Undisputed Facts [Doc. 43-1] or to Target's Response to NEIS's Statement of Undisputed Facts [Doc. 59-1], as those documents contain each party's factual assertions and the opposing party's responses.

[2] Target provided a copy of the OEA as Exhibit A to its Motion for Summary Judgment. [Doc. 1-1].

NEIS, as Faison-Sofran's successor in interest, has been the "Operator" of the Shopping Center under the OEA since January 2022. [*Id.* at ¶¶ 3–4]. Thus, the OEA now governs the relationship between Target and NEIS with respect to the common use and operation of the Shopping Center. [*Id.* at ¶ 7].

### 1. The Operation and Easement Agreement

The OEA establishes a framework for defining and maintaining various elements of the Shopping Center. *See* [Doc. 34-5]. The Court will save the analysis for later, but for the sake of convenience, it reproduces the OEA's relevant provisions here:

> ARTICLE I – DEFINITIONS
> . . .
> 1.5 <u>Common Area</u>. "Common Area" shall mean all areas within the exterior boundaries of the Shopping Center, exclusive of
> > (i) any Building,
> > (ii) any Outside Sales Area during the period such area is used for sales, display and/or storage purposes (but not any Common Utility Lines thereon or thereunder which shall remain Common Area), and
> > (iii) the Outlots, but not any Common Utility Lines located thereon, if any.[3]
>
> . . .
>
> 1.19 <u>Utility Lines</u>. "Utility Lines" shall mean those facilities and systems for the transmission of utility services, including the drainage and storage of surface water. "Common Utility Lines" shall mean those Utility Lines which are installed to provide the applicable service to both the Developer Tract and the Target Tract. . . .[4]

---

[3] [Doc. 34-5, p. 8].

[4] [*Id.* at p. 13].

3

ARTICLE II - EASEMENTS

. . .

2.2 <u>Utilities</u>.

. . .

(A) Each Party hereby grants and conveys to each other Party non-exclusive, perpetual easements in, to, over, under, along and across those portions of the Common Area (exclusive of any portion located within Building Areas) located on the grantor's Tract necessary for the installation, operation, flow, passage, use, maintenance, connection, repair, relocation, and removal of Utility Lines serving the grantee's Tract, including but not limited to, sanitary sewers, storm drains, water (fire and domestic), gas, electrical, telephone and communication lines. . . . If the Parties elect to install Common Utility Lines, all repair, maintenance, replacement and other work thereon shall be performed by Operator, if any, as part of Common Area maintenance.[5]

(C) Each Party hereby grants and conveys to each other Party owning a Tract the perpetual right and easement to discharge surface storm water drainage and/or runoff from the grantee's Tract over, upon and across the Common Area of the grantor's Tract . . . All surface water collection, retention and distribution facilities located on or within the Shopping Center shall be deemed a Common Utility Line.[6]

. . .

ARTICLE IV - MAINTENANCE AND REPAIR

4.1 <u>Utility Lines</u>.

. . .

(B) Common Utility Lines shall be maintained, repaired and/or replaced as part of the Common Area pursuant to Section 4.2 (A).[7]

---

[5] [*Id.* at p. 15].

[6] [*Id.* at p. 18].

[7] [*Id.* at p. 35].

. . .

4.2 <u>Common Area</u>.

(A) Subject to the joint maintenance provision set forth in Section 4.2(B), each Party shall maintain, or cause to be maintained, at its sole cost and expense, the Common Area on its Tract . . . . Such operation, maintenance, and repair obligation shall include but not be limited to the following:

. . .

(vi) Common Utility Lines.  Maintaining, cleaning, replacing and repairing any and all Common Utility Lines;

. . .

(xi) Stormwater Retention/Detention Areas.  Maintenance, cleaning and repairing all stormwater retention/detention areas located on the Shopping Center . . . .[8]

(B) . . . Operator shall operate and maintain the Common Area in accordance with the requirements of Section 4.2(A), subject to reasonably necessary deviations therefrom during periods of construction. . . .[9]

. . .

(F) If any portion of the Common Area is damaged or destroyed by any cause whatsoever, whether insured or uninsured, during the term of this OEA, other than damage caused by ordinary use or wear and tear, the Party upon whose Tract such Common Area is located shall repair or restore such Common Area at its sole cost and expense with all due diligence; provided, however, that no Party shall be required to expend more than $250,000 in Constant Dollars in excess of insurance proceeds which may be available ( or which would have been available except for such Party's election of deductibles or self-insurance, which amount such the Party shall be responsible to contribute) for such repair or restoration. Notwithstanding the limitation set forth in the preceding sentence, a Party may require another Party to do such restoration work if the requiring Party has agreed in writing to pay the costs in excess of $250,000.00. Except to the extent limited

---

[8] [*Id.* at pp. 35–38].

[9] [*Id.* at p. 38].

> by Section 5.4(0), if such damage or destruction of Common Area on its Tract is caused in whole or in part by another Party or a third Person, the Party obligated to make such repair or restoration reserves and retains the right to proceed against such other Party or third Person for indemnity, contribution and/or damages.[10]
>
> (G) Target shall have the right, upon giving not less than sixty (60) days' written notice to Operator, to take-over and assume the maintenance of the Common Area upon the Target Tract. Following the effective date of such take-over and assumption, Target shall maintain the Common Area on its Tract, and shall pay all costs and expenses incurred in connection therewith; provided, however, Operator shall continue to
>> (i) maintain the Common Utility Lines of the Shopping Center, including any detention/retention ponds, regardless of location,
>> (ii) maintain the Common Area supervisory program, if any,
>> (iii) insure the Common Area on the Target Tract under the Operator's Common Area public liability insurance program if Target elects to participate therein by written notice to Operator, and
>> (iv) maintain any Sign upon which a Target panel is attached. . . .[11]

### 2. Damage to the Shopping Center

In the Spring of 2023, the hillside to the west of the Target store started to collapse, and the collapse worsened in the following weeks. [Doc. 59-1, ¶¶ 15–16]. Around that same time, stormwater pipes that run under Target's Tract were destroyed. [Doc. 59-1, ¶ 16]. The parties dispute whether the pipes failed and caused the hillside to

---

[10] [*Id.* at pp. 45–46].

[11] [*Id.* at p. 46].

6

collapse or the other way around, but their requested relief doesn't require the Court to resolve that factual dispute. *See* [Doc. 59-1, ¶ 16].

### B.   Procedural Background

NEIS originally filed this declaratory judgment action on March 30, 2024, in the Superior Court of Bibb County, Georgia, seeking a declaration as to its rights and obligations under an Operation and Easement Agreement (OEA) that governed its relationship with Target, as a "Tenant" of the Shopping Center. [Doc. 1-1]. Target received service on April 11, 2024, and timely removed the action to this Court 14 days later. [Doc. 1]; *see* 28 U.S.C. § 1446(b)(2)(B).

On October 7, 2024, Target filed its Motion for Partial Summary Judgment [Doc. 34] asserting that NEIS, as the Operator under the OEA, is responsible for the maintenance and repair—including reconstruction and restoration—of the common utility lines throughout the shopping center. The Court held a hearing on November 5, 2024, and because these questions beg for resolution at this stage of litigation, the parties agreed that NEIS should file a cross motion for summary judgment. [Doc. 48].

On November 19, 2024, NEIS filed its Motion for Partial Summary Judgment [Doc. 54] seeking a declaration that Target, as the owner of the Target Tract, is obligated to reconstruct and restore the damaged common area, including utility lines. The Court held a second hearing on February 12, 2025, [Doc. 67]. Then, on joint motion by the parties, the Court stayed discovery on March 11, 2025. [Doc. 69].

C.     **Diversity Jurisdiction**

In its Notice of Removal, Target cited diversity jurisdiction as its basis for removing this action to federal court. [Doc. 1, ¶¶ 11–15]. So, before proceeding, the Court first determines whether it has original jurisdiction over the removed claims. *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999).

Federal courts are courts of limited jurisdiction, and they may only adjudicate cases as authorized by the Constitution and Congress. *Univ. of S. Ala.*, 168 F.3d at 409; *Gunn v. Minton*, 568 U.S. 251, 256 (2013). A civil action originally filed in a state court may be removed to a federal district court that has original subject-matter jurisdiction over the case. 28 U.S.C. § 1441. As the removing party, the burden is on Target to establish federal subject-matter jurisdiction. *See, e.g.*, *Friedman v. N.Y. Life Ins. Co.*, 410 F.3d 1350, 1353 (11th Cir. 2005).

Subject-matter jurisdiction based on diversity of citizenship exists where the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a)(1). Having considered the pleadings, and having employed the Court's "judicial experience and common sense," the Court finds that § 1332's first prong—the amount-in-controversy requirement—is easily met. *Williams v. Best Buy Co.*, 269 F.3d 1316, 1319–20 (11th Cir. 2001) (citations omitted); *Roe v. Michelin N. Am., Inc.*, 613 F3d 1058, 1061–62 (11th Cir. 2010) (citations omitted); *see* [Doc. 1, ¶¶ 6, 9].

The next issue is whether § 1332's second prong—the "diversity of citizenship" requirement—is satisfied. *See* 28 U.S.C. § 1332(a). Diversity jurisdiction demands complete diversity. *See Triggs v. John Crump Toyota*, 154 F.3d 1284, 1287 (11th Cir. 1998). In other words, "every plaintiff must be diverse from every defendant." *Id.*

Although Target's Notice of Removal sufficiently alleges its Minnesota citizenship for the purposes of diversity jurisdiction, [Doc. 1, ¶ 12], it merely states that "NEIS is a Georgia limited liability company" without alleging NEIS's state of citizenship, if any. [Doc. 1, ¶¶ 11–12]; *see Mallory & Evans Contractors & Eng'rs, LLC v. Tuskegee Univ.*, 663 F.3d 1304, 1305 (11th Cir. 2011) (noting that for the purposes of diversity jurisdiction, a limited liability company is a citizen of any state of which a member of the company is a citizen). This omission renders Target's jurisdictional pleading deficient.

To resolve this deficiency, the Court turns to the record to determine whether any admissions or record evidence cure the defect. *Molinos Valle Del Cibao, C. por. A. v. Lama*, 633 F.3d 1330, 1342 n.12 (11th Cir. 2011).[12] NEIS's Jurisdictional Statement, contained in its Corporate Disclosure Statement filed pursuant to Local Rule 87.2, clarifies that "it is wholly owned by its two members, Zachary Zurich and Andrew

---

[12] *See also Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013) (citing *Sun Printing & Publ'g Ass'n v. Edwards*, 194 U.S. 377, 382 (1904) ("The whole record . . . may be looked to, for the purpose of curing a defective averment of citizenship, where jurisdiction in a Federal court is asserted to depend upon diversity of citizenship . . . ."))

Neiswenter," who "are both domiciled in the State of Florida." [Doc. 5, ¶ 3]; *See Travaglio*, 735 F.3d at 1268-69 (providing that to establish diversity jurisdiction with respect to a natural person, the pleadings must allege the person's citizenship or domicile). Satisfied that NEIS is a citizen of Florida for the purposes of diversity jurisdiction, the Court finds that the complete diversity requirement is met and that it may properly exercise diversity jurisdiction over this case. *See Tuskegee Univ.*, 663 F.3d at 1305; *Triggs*, 154 F.3d at 1287.

Next, the Court explains the legal standard that guides its analysis.

## **LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact[] and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)).

As to issues for which the non-movant would bear the burden of proof at trial, the movant may either (1) point out an absence of evidence to support the non-movant's case or (2) provide "affirmative evidence demonstrating that the [non-

movant] will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)). If the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings[] and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the [non-moving] party.'" *Four Parcels*, 941 F.2d at 1438 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006).

In considering a motion for summary judgment, courts must accept the evidence presented by the non-movant as true and draw all justifiable inferences in its favor. *Liberty Lobby*, 477 U.S. at 255. However, courts are not required to draw "all possible inferences" in favor of the nonmovant. *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011). "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001).

## DISCUSSION

Both parties move for partial summary judgment. [Doc. 34]; [Doc. 54]. The Court finds that no factual disputes stand in the way of summary judgment. See LR 56, MDGa; [Doc. 43-1]; [Doc. 59-1]. Because the parties agree on the material facts, their motions require the same analysis, *see Liberty Lobby*, 477 U.S. at 255, and the Court addresses them together by interpreting the OEA under Georgia law.[13]

Target's Motion for Summary Judgment seeks a declaration that, under the plain language of the OEA, (1) "NEIS is responsible for maintaining the Shopping Center's Common Utility Lines;"[14] (2) "The Shopping Center's stormwater management system, which includes all stormwater pipes and detention ponds, are Common Utility Lines and are not Common Area located on the Target Tract;" and (3) "NEIS is responsible for maintaining the Shopping Center's stormwater management system, including all stormwater pipes and detention ponds." [Doc. 34-1, p. 5].

NEIS, on the other hand, seeks a declaration that, under the OEA, (1) "Target is responsible for the reconstruction and restoration of any destroyed portion of the Common Area on the Target Tract;" and (2) "the Common Utility Lines on the Target Tract are part of the Common Area that Target must reconstruct and restore following

---

[13] Neither party disputes that Georgia law governs the construction of the OEA.

[14] NEIS does not dispute (and never has disputed) that, under the OEA, it is required to maintain the Common Utility Lines under normal circumstances. *See* [Doc. 65, p. 2].

catastrophic events." [Doc. 54-2].

"The construction of a contract is a question of law" that involves three steps: (1) if "the language is clear and unambiguous," "the court simply enforces the contract according to its clear terms"; (2) "if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity"; and (3) "if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury." *City of Baldwin v. Woodard & Curran, Inc.*, 743 S.E.2d 381, 389 (Ga. 2013) (citation omitted); *see* O.C.G.A. § 13-2-1. The meaning of a "plain and unambiguous" policy is a question of law "and is 'particularly appropriate for summary [judgment].'" *Sims v. Taylor*, 270 F. App'x 940, 944 (11th Cir. 2008) (quoting *Garvin v. Smith*, 510 S.E.2d 863, 864 (Ga. Ct. App. 1999)); O.C.G.A. § 13-2-1.

  A. <u>**The OEA is Clear and Unambiguous**</u>

First, the Court considers whether any ambiguity in the OEA stands in the way of judgment as a matter of law. "Ambiguity exists when the language may be fairly understood in more than one way; language is unambiguous if it is capable of only one reasonable interpretation." *Capital Color Printing, Inc. v. Ahern*, 661 S.E.2d 578, 583 (Ga. Ct. App. 2008). Otherwise-unambiguous language does not become ambiguous because of extrinsic circumstances, *see Walton v. Datry*, 363 S.E.2d 295 (Ga. Ct. App. 1987), or because a party claims that the language does not say what it was intended to say. *See*

13

*Emerson v. Cousins Mortg. & Equity Invs.*, 244 S.E.2d 890 (Ga. Ct. App. 1978).

Neither party has drawn the Court's attention to any ambiguity in the OEA. That's not to say that the parties agree on its interpretation, but neither party has offered a reasonable alternative interpretation of the OEA. And, having reviewed the contract thoroughly, for the reasons explained below, the Court finds that the OEA is "clear and unambiguous." *City of Baldwin*, 743 S.E.2d at 389; *see* O.C.G.A. § 13-2-1.

### B. The Clear Terms of the OEA

Because the OEA is "clear and unambiguous," "the [C]ourt simply enforces the contract according to its clear terms." *City of Baldwin*, 743 S.E.2d at 389; *see* O.C.G.A. § 13-2-1. But what are those clear terms?

First, the Court finds that stormwater pipes are clearly and unambiguously part of the "Common Area" under the OEA. [Doc. 34-5, pp. 8, 12, 18]. Under Section 2(C), "[a]ll surface water collection, retention and distribution facilities located on or within the Shopping Center shall be deemed a Common Utility Line," [*Id.* at p. 18], and Common Utility Lines are considered Common Area under Section 1.5. [*Id.* at p. 8]. Neither party disputes this. [Doc. 47, p. 2]; [Doc. 43, pp. 3–4].

Next, the Court finds that the stormwater pipes under Target's Tract specifically are—like all other stormwater pipes at the Shopping Center—part of the Common Area under the OEA, regardless of whether Target exercised its right to assume the Common Area maintenance obligation. Section 4.2(G) grants Target the right "to take-over and

assume the maintenance of the Common Area upon [its] Tract." [Doc. 34-5, p. 46]. However, the provision contains specific carve-outs and does not extend to all aspects of the Common Area. *See* [*id.*]. Specifically, it provides that even if Target assumes maintenance of its Common Area, NEIS "must continue to . . . maintain the Common Utility Lines," among other things. [*Id.*].

Finally, the Court finds that the OEA obligates Target to repair any portion of the Common Area on its Tract if it sustains non-ordinary-wear-and-tear damage. Under Section 4.2(F) "[i]f any portion of the Common Area is damaged or destroyed by any cause . . . other than damage caused by ordinary wear and tear, the Party upon whose Tract such Common Area is located shall repair or restore such Common Area at its sole cost and expense." [Doc. 34-5, p. 45]. Because the damaged stormwater pipes on Target's tract are part of the Common Area, the OEA leaves no room for a reasonable interpretation that NEIS would be required to repair them.

Target mistakenly conflates the OEA's maintenance and repair obligations. Although the OEA does not define "maintenance" or "repair," these words are conceptually distinct as a matter of grammar and under the OEA's structure as a whole. To "maintain" means "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair or upkeep." *Maintain*, Black's Law Dictionary (12th ed. 2024). Whereas to "repair" means "[t]o restore to a sound or good condition after decay, waste, injury, partial destruction, dilapidation, etc." *Repair*, Black's Law

15

Dictionary (12th ed. 2024). In other words, maintenance is regular upkeep, while repair involves restoring something after damage. To be sure, even though Target assumed the Common Area maintenance obligation under Section 4.2(G), NEIS must still *maintain* the Common Utility Lines on Target's Tract. [Doc. 34-5, p. 46]. However, as explained above, because the stormwater pipes are Common Utility Lines, which in turn are considered Common Area, Section 4.2(F) requires Target to *repair* any Common Utility Lines on its Tract that are damaged by non-ordinary-wear-and-tear damage. [*Id.* at p. 45].

While Target contends that Section 4.2(G) "modifies or narrows the definition of Common Area" by carving out Common Utility Lines from its maintenance obligations, thereby transferring repair responsibilities to NEIS, *see* [Doc. 47, p. 3], the Court finds this argument unpersuasive. Section 4.2(G) transfers routine maintenance responsibilities, and it simply does not follow that Section 4.2(G)'s carve-out of certain parts of the Common Area, including Common Utility Lines, from Target's *maintenance* obligations affects Target's repair obligation under 4.2(F) at all. [Doc. 34-5, p. 46]. In other words, even though Target assumed the day-to-day Common Area maintenance obligations on its Tract, Section 4.2(F) unequivocally mandates that the party on whose Tract the damage occurs must repair or restore that portion of the Common Are if it is damaged by anything other than normal wear and tear. [*Id.* at p. 45]. Since the stormwater pipes at issue are clearly part of the Common Area, as established above,

16

Target remains obligated to repair them when they are damaged.

Furthermore, although Target argued at the hearing that it would be counterintuitive for it to bear the cost of repairing stormwater pipes that benefit the entire shopping center merely because they happen to be on its Tract, the undisputed and unambiguous language of the OEA leaves no room for any other reasonable interpretation. *See* [*id.*].

For those reasons, the Court rejects Target's argument that its assumption of Common Area maintenance obligations limits its repair obligations under the OEA.

## CONCLUSION

Accordingly, because the OEA clearly and unambiguously obligates Target to repair the damaged stormwater pipes on its Tract, the Court must enforce it "according to its clear terms." *City of Baldwin*, 743 S.E.2d at 389 (citation omitted); *see* O.C.G.A. § 13-2-1. Thus, the Court **DENIES** Target's Motion for Partial Summary Judgment [Doc. 34], **GRANTS** NEIS's Motion for Partial Summary Judgment [Doc. 54], and **DECLARES** that Section 4.2(F) of the OEA obligates Target to repair or restore any part of the Common Area on its Tract, including stormwater pipes, damaged or destroyed by any cause other than normal wear and tear.

**SO ORDERED**, this 27th day of March, 2025.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**